John P. Aldrich, Esq.
Nevada Bar No. 6877
**ALDRICH LAW FIRM, LTD.**
7866 West Sahara Avenue
Las Vegas, Nevada 89117
Tel:  (702) 853-5490
Fax:  (702) 227-1975

*Local Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| MANJAN A. CHOWDHURY, Derivatively on Behalf of Nominal Defendant PLAYAGS, INC. <br><br> Plaintiff, <br><br> v. <br><br> DAVID LOPEZ, KIMO AKIONA, DAVID SAMBUR, DANIEL COHEN, ERIC PRESS, YVETTE E. LANDAU, ADAM CHIBIB, GEOFF LANDAU, and ANNA MASSION, <br><br> Defendants, <br><br> and <br><br> PLAYAGS, INC., a Nevada Corporation, <br><br> Nominal Defendant, | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Manjan Chowdhury ("Plaintiff"), by and through his attorneys, brings this derivative complaint for the benefit of nominal defendant, PlayAGS, Inc. ("PlayAGS" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers (collectively the "Defendants") seeking to remedy certain Defendants' breaches of fiduciary duties and contribution for violations of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by PlayAGS with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.      NATURE OF THE ACTION AND OVERVIEW

1.      PlayAGS is a designer and supplier of electronic gaming machines ("EGM") and other products and services for the gaming industry that operates with three business segments: EGMs, Table Products and Interactive.  The EGMs segment accounted for 95% of the Company's revenues from a library of over 380 proprietary game titles delivered on several EGM cabinets, including *ICON* and *Orion Upright* (the Company's core cabinets), *Orion Portrait* (a premium cabinet) and *Orion Slant* (a core plus cabinet) and *Big Red/Colossal Diamonds* (a specialty large-format jumbo cabinet).

2.      PlayAGS operates primarily in the North American gaming market, which includes U.S. commercial casinos, Native American casinos, Canadian casinos, video lottery terminals ("VLT") and Mexican casinos.  Oklahoma was said to be a "key jurisdiction" for the Company as it earned a substantial portion of its revenues from EGMs in the state's Native American casinos, including from its largest customer, the Chickasaw Nation.

3.      Leading up to and following its January 2018 initial public offering ("IPO"), PlayAGS sought to grow its recurring revenue from its existing customers by installing newer and more competitive game content on its older EGMs, which was referred to as its "optimization strategy."  The strategy appeared to be successful as it reported robust growth quarter after quarter

in 2018.  In May 2018, the Company reported the "most EGM sales revenue in [the] Company's history."  The strategy was validated when PlayAGS repeatedly revised its guidance upward based on its reported performance and "greater visibility" into its products, suggesting the growth would continue.

4.    However, unbeknownst to stockholders, this "growth" was attributable to unsustainable sales tactics to meet its projections, including revenue smoothing, *i.e.*, pressuring the sales team to place orders earlier or later than planned to meet quarterly sales goals.  Moreover, many of the EGMs the Company was acquiring in the Oklahoma market were outdated and subject to unfavorable revenue sharing terms, that the Company was flooding the Oklahoma market with more EGMs than it could sustain.

5.    Meanwhile, the Company acquired Integrity Gaming Corp. ("Integrity"), which operated over 2,500 gaming machines in over 33 casinos in Oklahoma and Texas, in February 2019 to "strategically grow [its] EGM installed base."  In reality, the revenue-per-day ("RPD") for Integrity's EGMs was substantially lower than PlayAGS's, meaning the acquisition would result in an oversaturation of its products in the Oklahoma market.

6.    The truth began to emerge on August 7, 2019 when PlayAGS reported a net loss of $7.6 million and lowered its 2018 guidance due to underperformance in Oklahoma.  The issues stemmed in part from the Company's decision to place 800 incremental EGMs with low RPD into Oklahoma over the past year.  Nevertheless, management claimed the Company was "implementing a variety of measures" to correct these "very well known" problems.  On this news, the Company's share price fell $8.99, or nearly 52%, to close at $8.31 per share on August 8, 2019, on unusually heavy trading volume.

7.    Then, on November 7, 2019, PlayAGS revealed that its domestic RPD decreased and once again lowered its guidance.  Lopez told investors the Company was "addressing [these issues] with specific and targeted countermeasures" and assured that the Company had "seen the bottom" of its issues in Oklahoma.  On this news, PlayAGS's stock price fell 6.71% to close at $11.82 per share on November 8, 2019.

8.     Finally, on March 4, 2020, the extent of the Company's problems in Oklahoma was revealed when the Company announced it was selling up to 1,000 underperforming units to generate capital to reinvest in "higher-performing markets."   This contradicted prior statements about the strength of the Oklahoma market and assurances that it could correct the issues it was experiencing, revealing that its sales tactics and flooding of the Oklahoma market were unsustainable.   On this news, PlayAGS's stock price fell 18.7% to close at $6.65 per share on March 5, 2020.

9.     These revelations precipitated the filing of a securities class action in this District against PlayAGS and certain defendants, *In re PlayAGS, Inc. Securities Litigation*, Case No. 2:20-cv-01209-JCM-NJK (the "Securities Class Action").

10.     Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board. The Board is currently composed of seven members, all of whom are named in this action. Among other things, six of the seven current directors are defendants in claims pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. §77k (the "Securities Act"). Claims pursuant to Section 11 of the Securities Act do not require a showing of intent or scienter. Accordingly, these six directors face a substantial likelihood of liability in that action and could not disinterestedly investigate whether their violations of Section 11 constituted breaches of fiduciary duties under Nevada law. Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. §1332 because complete diversity exists among Plaintiff and all of the defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     Additionally, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: contribution for violations of Section 10(b) of the Exchange Act.

13.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 17 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this District.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**III.     PARTIES**

**Plaintiff**

16.     Plaintiff Manjan Chowdhury purchased shares of PlayAGS in September 2018 and has continuously owned his PlayAGS stock since that date.  Plaintiff is a citizen of Georgia.

**Nominal Defendant**

17.     Defendant PlayAGS is incorporated under the laws of Nevada with its principal executive offices located in Las Vegas, Nevada.  PlayAGS's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "AGS."  PlayAGS is a citizen of Nevada.

**Defendants**

18.     Defendant David Lopez ("Lopez") has served as the Chief Executive Officer and President of the Company since February 3, 2014.  Defendant Lopez has also served on the Board of Directors since May 2017.  He is named as a defendant in the Securities Class Action. Lopez is a citizen of Nevada.

19.     Defendant Kimo Akiona ("Akiona") was, at all relevant times, the Chief Financial Officer ("CFO") of the Company.  He is named as a defendant in the Securities Class Action. Akoina is a citizen of Nevada.

20.     Defendant David Sambur ("Sambur") has served as a member of the board since November 2017.  Sambur was also a Co-Lead Partner at Apollo Global Management LLC.  He is named as a defendant in the Securities Class Action. Sambur is a citizen of New York.

21.     Defendant Daniel Cohen ("Cohen") has served as a member of the board of the Company since May 2017.  Cohen was also a Principal at Apollo Global Management LLC.  He is named as a defendant in the Securities Class Action.  Cohen is a citizen of New York.

22.     Defendant Eric Press ("Press") served as a member of the Board of the Company from January 2018 until his resignation, effective July 25, 2019.  Press was also a Senior Partner at Apollo Global Management LLC.  He is named as a defendant in the Securities Class Action.  Press is a citizen of New York.

23.     Defendant Yvette E. Landau ("Landau") has served as a member of the Board of the Company since January 2018. Landau was a member of the Audit Committee at all relevant times. She is named as a defendant in the Securities Class Action. Landau is a citizen of Nevada.

24.     Defendant Adam Chibib ("Chibib") has served as a member of the Board of the Company since January 2018.  Chibib was the Chair of the Audit Committee at all relevant times. He is named as a defendant in the Securities Class Action.  Chibib is a citizen of Texas.

25.     Defendant Geoff Freeman ("Freeman") has served as a member of the Board since November 7, 2018, and was a member of the Audit Committee at all relevant times.  He is named as a defendant in the Securities Class Action. Freeman is a citizen of Virginia.

26.     Defendant Anna Massion ("Massion") has served as a member of the Board since June 17, 2019.  Massion is a citizen of Connecticut.

27.     Defendants Lopez, Akiona, Sambur, Cohen, Press, Landau, Chibib, Freeman, and Massion are collectively referred to herein as the "Individual Defendants."

**Relevant Non-Parties**

28.     Apollo Global Management, LLC ("Apollo"), together with its subsidiaries, is a global investment firm that manages multiple alternative asset classes to generate investment returns for its fund investors.   Apollo, through its affiliates, Apollo Gaming Holdings, L.P. ("Apollo Gaming"), Apollo Investment Fund VIII, L.P. ("Apollo Investment"), and AP Gaming VoteCo, LLC acquired PlayAGS in 2013.   Apollo unloaded more than half of its investment in PlayAGS by selling its shares to the investing public in offerings conducted in 2018 and 2019. Apollo controlled 51.9 percent of the Company's common stock prior to the August 2018 IPO and 33.1 percent prior to the March 2019 SPO.   After the March 2019 SPO, Apollo controlled 22.8 percent of the Company's common stock.  In total, Apollo off-loaded more than $254 million worth of PlayAGS common stock on the investing public in these offerings.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers, directors, and/or fiduciaries of PlayAGS and because of their ability to control the business and corporate affairs of PlayAGS, at all relevant times, the Individual Defendants owed PlayAGS and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage PlayAGS in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of PlayAGS and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to PlayAGS and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of PlayAGS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with PlayAGS, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

31.     To discharge their duties, the officers and directors of PlayAGS were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of PlayAGS were required to, among other things:

      a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of the business;

      b.  Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

      c.  Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

      d.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

32.     The Audit Committee Charter, effective January 19, 2018, stated that its members' responsibilities included:

> Review and discuss the Company's annual audited and quarterly unaudited financial statements with management (including the Company's internal audit group) and the Company's independent auditor, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form 10-K or quarterly reports on Form 10-Q.

*     *     *

> Review and discuss with management the Company's earnings press releases, including the use of non-GAAP financial measures and other "pro forma" or "adjusted" presentations, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), and each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.

*     *     *

Review and discuss with management the Company's major financial risk exposures and management's risk assessment and risk management policies.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Background

33.   PlayAGS is a designer and supplier of electronic gaming machines ("EGM"), including slot machines, video bingo machines, and other electronic gaming devices.  It operates primarily in North America and has three business segments: (i) electronic gaming machines ("EGM"), which comprises 95% of the Company's revenue and provides 380 game titles on EGM cabinets; (ii) table products, including live felt table games, side bet offerings, progressives, signage, and other ancillary table game equipment; and (iii) interactive, which offers social casino games including online versions of the Company's game titles.

34.    In the United States, a significant portion of the Company's EGMs are located in Native American casinos with over 360,000 Class II and Class III EGMs.  PlayAGS derives a significant portion of its revenues from Native American casinos in Oklahoma.  Native American gaming is regulated under the Indian Gaming Regulatory Act of 1988 ("IGRA"), which classifies legalized gaming into three categories: Class I, Class II, and Class III.

35.   PlayAGS does not operate in the Class I industry, which is characterized by traditional and social games that are a part of tribal ceremonies and have minimal prizes.  Class II gaming includes EGMs that utilize bingo and similar games, but excludes slot machines; they do not require an agreement with the state and do not require revenue sharing with the state.  Class III gaming includes slot machines, blackjack, craps, roulette, wagering games and electronic facsimiles of any game of chance that are found in commercial casinos and in Native American casinos that have entered into a state compact that permits a specified number of Class III machines.  Class III gaming requires Native American tribes to enter into a compact with the state in which their casino is located, which typically includes revenue sharing with the state.

36.   Most of the Company's operations are concentrated in the Class II industry, which is located primarily in Oklahoma. At the time of the IPO, Oklahoma was PlayAGS's "largest

market" and accounted for 22% of total revenue. Its largest customer, the Chickasaw Nation accounting for 9% of the Company's revenue, is also based in Oklahoma.

37.     The Company claimed Class II gaming was "highly relationship based" and appealed to Native American tribes because it is not subject to revenue sharing and there are no limits on the number of Class II gaming machines that may be operated in any one facility.  Furthermore, a tribe's Class II portfolio provides it leverage when negotiating its Class III agreement with the state.

38.     The Company gives its customers the option of leasing or purchasing their EGMs and associated gaming systems in exchange for cash for sold items or a share of the revenue generated, which is either a flat monthly fee or a daily fee.  Substantially all of the Company's EGM revenues are derived from revenue sharing or fee-per-day lease agreements, which PlayAGS refers to as a "participation model."  The revenue from these agreements is often called revenue-per-day or "RPD."

39.     The Company received $153.3 million from its initial public offering ("IPO") on January 30, 2018.  In the years leading up to the IPO, PlayAGS saw dramatic growth.  The Company's total revenue grew from $158 million in 2015 to $167 million in 2016, and as of September 30, 2017, it had already hit $197 million, 83% of which was recurring revenue.  PlayAGS touted its growth in revenue (20% year-over-year), its product footprint, and "2017 Major Events," which included "the most successful product launch in AGS history," "record revenue," and "2x the number of EGM sold in all of 2016" in the first half of 2017.  The Company also highlighted its higher-than-industry-average RPD in both Casino-owned games (i.e., where the casino purchased the machines) and in the "premium" leased game market.

40.     PlayAGS also touted its strategy to grow its market share through acquisitions.  One such acquisition was Cadillac Jack, a provider of Class II gaming machines for the North American tribal gaming market, which it acquired in May 2015 and claimed would create growth opportunities in Class II and Class III jurisdictions.

**B.     The Individual Defendants Caused PlayAGS to Issue Misleading Statements**

41.     Following the IPO, to continue its aggressive growth, PlayAGS employed an "optimization" strategy, which involved installing newer and more competitive game content, such

as *Orion*, *Portrait* and *ICON*, on its older EGMs.  The strategy was supposed to grow recurring revenue by "serving profit-enhancing upgrades to some of [its] legacy units in the field," satisfying PlayAGS's long-term customers.

42.     On May 3, 2018, the Individual Defendants caused PlayAGS to issue a press release announcing its 1Q'18 financial results, which reported a 36 percent year-over-year increase in total revenue over the prior year period to $64.9 million.  The earnings release indicated that PlayAGS sold 838 EGMs, up 85 percent year-over-year and net loss improved to $9.5 million from $12.4 million.  In addition, PlayAGS increased its guidance based on "greater visibility" on its newer products throughout the year.  The press release stated, in relevant part:

> "The first quarter of 2018 was absolutely tremendous for AGS - we achieved records in every key category, including revenue, adjusted EBITDA, average selling price, and recurring revenue.  We reported the most EGM sales revenue in our company's history with 838 units sold, driven largely by the continued success of the Orion Portrait cabinet, while our Tables and Interactive segments both reported their strongest EBITDA quarters to date," said David Lopez, President and CEO of AGS. "With industry-leading game performance and the recent introduction of the new Orion Slant, ***AGS shows no signs of slowing down and we are confident that 2018 will be our best year yet***."

> *        *        *

> First Quarter Financial Highlights

> - ***Total revenue increased 36% to $64.9 million, a company record, driven by continued growth of our EGMs in the Class III marketplace, led by demand for our newer premium Orion Portrait cabinet.***

> - ***EGM equipment sales increased 107% to $15.2 million, another company record***, due to the sale of 838 units, approximately 60% of which were Orion Portrait cabinet.

> *        *        *

> 2018 Outlook

> Based on our year-to-date progress and due to our current momentum, we now expect our adjusted EBITDA in 2018 to be between $126 and $131 million. ***This is an upward revision to the guidance we previously released and is based on greater visibility that we now have for Orion Portrait and other products throughout the year***. We maintain our capital expenditures range of $55 to $60 million.

> ***AGS shows no signs of slowing down and we are confident that 2018 will be our best year yet.***

43.     The same day, PlayAGS held a conference call in connection with the financial results. During the call, defendant Lopez the Individual Defendants caused the Company to hold an earnings call where Lopez discussed the Company's Oklahoma expansion and its EGM optimization strategy:

> Turning to our EGM segment on Slide 5. We ended Q1 with a total recurring EGM base of 24,033 units up 13% year-over-year. In addition to the inclusion of the Rocket EGMs, recurring unit growth was bolstered by the 4 wins opening in Q1 where AGS received approximately 14% of the floor. ***Additionally, we benefited from a couple of expansions in Oklahoma. We continue to execute on our yield optimization strategy*** upgrading 1650 of our legacy machines on a trailing 12 month basis with our latest high-performing products. This mission serves to grow our recurring revenue and protect our base as well as ***support our loyal long-term customers by providing them with our newer, more profitable products.*** As of Q1, approximately $5.6 million of our recurring revenue came from our optimization efforts over the past two years. We sold 838 EGMs for a total of $15.2 million in sales revenue for the quarter up 107% over the prior year period.

44.     On that same call, defendant Akiona said EGM revenue growth was due to the expansion in Oklahoma, increases in the Company's EGM units and domestic RPD:

> ***For the first quarter of 2018, total revenues were up 36% to $64.9 million of which $61.3 million were from EGMs, $1.7 million from table products and $1.9 million from interactive. The increase in revenues were fueled primarily by a substantial increase in EGM equipment sales, an increase in our EGM installed base as well as an increase in our domestic revenue per day, or RPD***. Revenue for the first quarter also included approximately $4.1 million of EGM recurring revenue from our recent Rocket Gaming asset acquisition that was completed in December.
>
> Turning to our EGM segment, gaming operations revenue increased 22% in the first quarter to a record $46 million. The year-over-year increase primarily reflects a larger domestic install base that grew by over 2500 units or 18%. Approximately, 1500 of the unit increase was from the Rocket Gaming asset acquisition and the remaining organic increase was led by increases in Texas, Nevada, Florida and California. ***Also in the first quarter, we saw the install base grow in Indiana and Oklahoma by nearly 500 units from new casino openings and expansions*** notably the 4 wins property in Indiana where we installed nearly 250 units in the quarter. ***Domestic RPD for the first quarter also increased by 3% to $26.72 compared to the first quarter of 2017, driven primarily by our optimization initiative as well as the rollout of our newer premium Orion Portrait cabinet.***

45.     Defendant Akiona said the Company's increase in gross margin was primarily due to the increase in RPD, stating:

> ***Gross margin for gaming operations increased to 82.9% in the first quarter, compared to 82.3% in the prior year period, primarily due to the increase in RPD.*** Equipment sales gross margin also increased to 51.4% to 47.5% due to the proportionally high amount of our premium Orion Portrait cabinet sales in the quarter.

46.     The above statements on May 3, 2018 were materially misleading because they failed to disclose that: (i) sales teams were pressured to inflate EGM-placement numbers, including persuading customers to place orders in an earlier or later quarter than planned and recording one sale as two sales; (ii) that, as a result, the key Oklahoma market was flooded with more EGMs than it could support and at unfavorable terms; (iii) that, as a result of the foregoing, PlayAGS's purported revenue growth was unsustainable.

47.     On August 2, 2018, the Individual Defendants caused PlayAGS to issue a press release announcing its 2Q 2018 financial results in a press release, reporting a 45% increase in total revenue over the prior year period to $72.8 million "driven by continued growth of our EGMs in the Class III marketplace, led by demand for our premium Orion Portrait cabinet."  Defendant Lopez was quoted as saying: "Because of the potential upside from these exciting opportunities in our EGM business and our strong first half of the year, we are raising our Adjusted EBITDA guidance to reflect a new range of $132 million to $136 million." The press release stated:

Second Quarter Financial Highlights

- ***Total revenue increased 45% to $72.8 million, a company record, driven by continued growth of our EGMs in the Class III marketplace***, led by demand for our premium Orion Portrait cabinet.

- ***Recurring revenue grew to $52.6 million or 26% year-over-year***. In addition to the contribution from the EGMs purchased from Rocket Gaming and Table Products purchased from In Bet in the Fall of 2017, ***the increase was driven by our strong Domestic revenue per day ("RPD") of $27.79, up $1.90 year-over-year.***

- ***EGM equipment sales increased 144% to $20.2 million, another Company record, due to the sale of 1,058 units,*** of which approximately 60% and 12% were Orion Portrait and Orion Slant cabinets, respectively.

- ***Net loss improved to $5.3 million from $20.1 million in the prior year, primarily due to increased revenue described above***.

*          *          *

2018 Outlook

Based on our year-to-date progress and due to our current momentum, we now expect our total Adjusted EBITDA in 2018 to be between $132.0 and $136.0 million. This is an ***upward revision to the guidance we previously released and is based on greater visibility that we now have for the installation and performance of Orion Portrait, Orion Slant, STAX, and other products for the remainder of the year, in addition to accelerated efforts to increase our footprint in sizable new markets***,

such as Canada. We maintain our capital expenditures range of $55.0 to $60.0 million.

48.    That same day, PlayAGS held a conference call in connection with the financial results. During the call, defendant Lopez claimed that PlayAGS was successfully executing its legacy EGM optimization strategy:

> Coming off a record-breaking first quarter, I was extremely proud of the team for continuing to deliver such solid results. **Q2 was a quarter highlighted by ongoing momentum in our EGM segment**, driven by the Orion Portrait Cabinet and bolstered by the successful launch of the new Orion Slant Cabinet.
>
> *          *          *
>
> We've made good progress with our yield optimization strategy, upgrading nearly 1,500 of our legacy machines on a trailing 12- month basis with our latest high-performing products. We are now starting to see real RPD improvement as the base of upgraded units continues to grow. **As of Q2, approximately $8.3 million of trailing 12-month recurring revenue came from our optimization efforts in both the U.S. and Mexico.**
>
> **As a result of optimization, growing the recurring footprint with new, high-performing product, and the overall health of our poor tribal markets, domestic RPD grew to its highest level in years, averaging $27.79 in Q2. This grew $1.90 from the prior-year period, and $1.07 sequentially.**

49.    On the same call, defendant Akiona attributed the Company's increased domestic RPD to new product offerings, its optimization strategy, and "strong performance" in Oklahoma:

> For the second quarter, **total revenues were up 45%** to $72.8 million, of which $69.3 million was from EGMs, $1.8 million from table products, and $1.7 million from interactive. **The increase in revenues were fueled primarily by a substantial increase in EGM equipment sales, and improved performance in our EGM gaming operations business, which was driven by a larger EGM install base as well as a notable increase in our domestic revenue per day, or RPD.**
>
> *          *          *
>
> **Total RPD for the current quarter also increased by 8.9%, to $21.77 cents compared to the second quarter of 2017, driven primarily by our new product offerings and through the optimization of our install base with our industry-leading EGMs. Notable was strong performance in certain key markets like Oklahoma**, Texas, Florida, and California, just to name a few.

The above statements on August 2, 2018 were materially misleading because they failed to disclose that: (i) sales teams were pressured to inflate EGM-placement numbers, including persuading customers to place orders in an earlier or later quarter than planned and recording one sale as two sales; (ii) that, as a result, the key Oklahoma market was flooded with more EGMs than

it could support and at unfavorable terms; (iii) that, as a result of the foregoing, PlayAGS's purported revenue growth was unsustainable.

50.     On November 8, 2018, the Individual Defendants caused PlayAGS to issue a press release announcing its 3Q 2018 financial results.  The earnings release reported that revenue had increased 34 percent over the prior year to $75.5 million and EGM equipment sales had again increased by 82 percent year-over-year.  The Company increased its guidance once again for the remainder of 2018.  The press release stated:

Third Quarter Financial Highlights

***Total revenue increased 34% to $75.5 million, a Company record, driven by continued growth of our EGMs in the Class III marketplace***, including entry into Alberta, Canada as well as a large sale to a long-standing tribal customer.

***Recurring revenue grew to $50.7 million, or 18% year-over-year***. In addition to the contribution from the EGMs purchased from Rocket Gaming, the increase was driven by our strong domestic revenue per day ("RPD") of $27.14, up $1.70 year-over-year as well as increases in Table Products revenue driven by an increase in Table Product units.

***EGM equipment sales increased 82% to $24.7 million, another Company record, due to the sale of 1,332 units***, of which approximately 24% were sold in Canada and 276 units were sold to a long-standing tribal customer.

***Net income improved to $4.3 million from a net loss of $4.1 million in the prior year period, primarily due to the increased revenue described above.***

*          *          *

2018 Outlook

Based on our year-to-date progress and due to our current momentum, we now expect our total Adjusted EBITDA in 2018 to be between $134.0 and $136.0 million. ***This is an upward revision to the guidance we previously released and is based on our progress executing against our many growth initiatives in the first half of the year and due to our improved visibility for the remainder of the year.***

51.     The earnings release quoted Lopez highlighting record EGM sales and growth opportunities:

***In the third quarter, AGS sold 1,332 EGMs, a 58% jump year-over-year, and a company record. Revenue hit an all-time high of $75.5 million***, demonstrating continued demand for our Orion Portrait cabinet and growing momentum for our new Orion Slant, in addition to significant progress in Canada, with 24% of our sold EGMs placed in several Canadian provinces. Our Tables segment posted its best quarter to date, with our innovative progressives contributing to a 30% increase in installs year-over-year. ***AGS is still very underrepresented in many markets both domestically and internationally, which presents significant long-term growth***

*opportunities for the Company due to our industry-leading game performance, an expanding suite of cabinet options, best-in-class R&D, and diversified product offerings.*

52.     The same day, PlayAGS held a conference call in connection with the financial results. During the call, defendant Lopez stated that PlayAGS was making "good progress" on its optimization strategy:

When thinking about the recurring install base, it's important to think about the quality of our base in addition to its size. So while we will be up slightly in the recurring units over 2017, it's with a better mix of units positively impacting our RPD. This is part of our ongoing optimization strategy, and we will always look for the highest return on invested capital for our equipment. We continue to make good progress with this strategy, upgrading more than 880 of our legacy machines year-to-date. As a result of optimization, growing the recurring footprint with new high-performing product and the overall health of our core tribal markets, domestic RPD grew by $1.70 year-over-year, to $27.14.

53.     During the same call, defendant Akiona touted "record EGM equipment sales" and "strong RPD performance":

For the third quarter, total revenues were up 34%, to $75.5 million, of which $71.8 million was from EGMs, $2.1 million from Table Products and $1.7 million from Interactive. The increase in revenues were driven by record EGM equipment sales, primarily in early entry markets such as Canada and Nevada, as well as improved performance in our gaming operations business with a notable increase in our domestic RPD.

David mentioned the growth in our recurring revenue year-over-year, which was driven by several factors. First, the contribution of EGMs purchased from Rocket Gaming. Second, an increase in Orion Portrait cabinets on lease year-over-year. We ended the third quarter with almost 1,700 Orion Portrait cabinets on lease, up from 500 in the prior year period. Third, strong RPD performance from our domestic and international EGM gaming operation businesses. And fourth, an increased install base of Table Product units on lease, up 715 units year-over-year, driven by the in-bet assets, new openings and the continued success of our progressives and side bets.

54.     During the same call, defendant Lopez claimed Oklahoma "continues to be a healthy market for us" and discussed how optimization was lifting the Company's RPD on the call:

And of course, as you know, and we talk about on every call, and we talked about in the prepared remarks again today, *optimization is a big part of getting that RPD lift. We continue to stay committed to that.*

*So it's all about going out there and getting to the jurisdictions. You know what they are, mostly. But we stay focused. And we look at Oklahoma, and you look at our penetration in Oklahoma, but we continue to add units in Oklahoma. It continues to be a healthy market for us.* We're having units in every corner of the U.S., Canada and Mexico, wherever we know that it's a strong lease jurisdiction. So we just stay focused on that. It's going to be a huge focus obviously in Q4 and beyond

and exactly something that when we look at 2019 that we're going to stay focused on.

55.     Defendant Akiona highlighted increased RPD in Oklahoma on the call:

***Domestic RPD for the current quarter increased by $1.70, to $27.14, compared to the third quarter of 2017, driven primarily by our new product offerings and through the ongoing optimization of our install base with our industry-leading EGMs. Notable increases were seen in certain markets like Oklahoma***, Texas, Florida, California and Washington, to name a few. International RPD for the current quarter also increased, by $0.19, to $8.52, compared to the third quarter of 2017, driven by the optimization of our install base.

56.     In response to analyst questions regarding expansion in the Oklahoma market, Defendant Lopez stated:

***So as far as the risk goes, we don't see anything just yet***, and I think it'd be very early in the game to talk about how Arkansas casinos could risk anything up in Oklahoma. I don't think that we will see the Oklahoma customer going to Arkansas. And I'd also say that Oklahoma sort of has some of the finest operators out there in the country, and they're going to, in the words of our president, secure their borders, if you will. They're going to: a) make sure that their players stay in the state and; b) they're going to continue to draw players from other states because they do what they do and they do it very well.

So I think that – and as far as upside goes, nothing specific, ***but we always say modest growth in those jurisdictions, modest growth in Class II and modest growth in Oklahoma***. Now they do have some projects that are coming online. We haven't sort of published numbers on what we're going to do in those arenas yet, but they do have some expansions and some new projects that are coming online. And we'll obviously continue to get our fair share, if you will, of the Chickasaw market as they expand and as every other tribe in Oklahoma expands, as well.

57.     The above statements on November 8, 2018 were materially misleading because they failed to disclose that: (i) sales teams were pressured to inflate EGM-placement numbers, including persuading customers to place orders in an earlier or later quarter than planned and recording one sale as two sales; (ii) that, as a result, the key Oklahoma market was flooded with more EGMs than it could support and at unfavorable terms; (iii) that, as a result of the foregoing, PlayAGS's purported revenue growth was unsustainable.

58.     In early to mid-2018, PlayAGS began the process of acquiring Integrity which would further flood the Oklahoma market with low performing EGMs.  The Company announced the Integrity acquisition in December 2018, noting its "roots are in Oklahoma, and [it was] excited to invest further in a market [it was] passionate about and where [it] already [had] strong sales and customer support networks."  The acquisition was finalized on February 8, 2019, adding 2,600

recurring revenue units to PlayAGS's installed base in Oklahoma and Texas.  On the Company's 4Q 2018 earnings call, Lopez said the acquisition was a "great example of [PlayAGS's] commitment to strategically grow our EGM installed base."

59.   On March 5, 2019, the Individual Defendants caused the Company to issue a press release announcing PlayAGS's 4Q 2018 and FY 2018 financial results.  The press release reported that total revenue had increased 25 percent over the prior year to $72.1 million and EGM equipment sales had increased by 86 percent.  The Company also gave adjusted EBITDA guidance for 2019 in the range of $160.0 to $164.0 million. The press release stated:

Fourth Quarter 2018 Financial Highlights

- ***Total revenue increased 25% to $72.1 million, driven by continued growth in our EGM segment in the Class III marketplace***, primarily in early-entry markets such as Ontario, Mississippi and Nevada as well as continued penetration into ramping markets such as California and Florida.

- EGM equipment sales increased 86% to $23.2 million, due to the sale of 1,159 units, of which nearly 60% were sold into early-entry markets.

- ***Gaming operations revenue, or recurring revenue, grew to $48.9 million, or 8% year-over-year***, driven by EGMs purchased from Rocket Gaming, increased domestic revenue per day ("RPD") of $26.41, growth and performance of our international installed base, and an increase in Table Products revenue.

\*       \*       \*

2019 Outlook

We expect to generate total Adjusted EBITDA(4) of $160.0 - $164.0 million in 2019, representing growth of approximately 17% - 20% compared to 2018. We further expect 2019 capital expenditures to be in the range of $65.0 - $69.0 million, compared to $66.2 million in 2018, reflecting ***an expectation for a continued increase in our installed base in both existing and new markets as well as our ongoing yield optimization initiative, which includes units recently purchased from Integrity***.

60.   The earnings release quoted Lopez was quoted touting the Company's "phenomenal growth" and opportunities from the Integrity acquisition:

We ended our first year as a public company with a solid fourth quarter and 35% growth in annual revenue," said Chief Executive Officer David Lopez. "***Our continued top line growth, increased operating cash, and free cash flow generation reflects the industry-leading performance of our products and AGS' unique position given how underrepresented we are in the market. These two factors contributed to our phenomenal growth in electronic gaming machines ("EGMs"), ending the year with more than 4,300 sold units, a 71% increase from fiscal 2017.***

*We kicked off 2019 with the close of our acquisition of Integrity Gaming Corp., which bolsters our recurring revenue footprint and provides long-term optimization opportunities*. With new product and content launches, further penetration of both new and early-entry markets, and international expansion, ***AGS is positioned for another high-growth year in 2019.***

61.    The same day, PlayAGS held a conference call in connection with the financial results. During the call, defendant Akiona attributed the increase in the Company's EGM install base primarily to its Oklahoma market:

*Our domestic EGM installed base grew by over 200 units year-over-year* despite the voluntary removal of 500 machines in Texas earlier in the year and the reduction of 420 VLT units in Illinois through an end of lease buyout by a customer. As David mentioned earlier, these units were not counted in our sold unit count. Excluding the end of lease buyout of the Illinois VLT units in the fourth quarter, we would have had net placements of 650 recurring units sequentially, *with the majority of those units being placed in Oklahoma*.

62.    During the same call, defendant Akiona also touted that the Company's legacy EGM optimization strategy, stating in relevant part: ***"Domestic RPD for the current quarter increased by $0.53 to $26.41 compared to the fourth quarter of 2017, driven primarily by our new product offerings through the ongoing optimization of our installed base with our leading EGMs."***

63.    During the same call, defendant Lopez stated on the call that the Company's "total EGM recurring base of 24,647 units, up roughly 4% year-over-year and more than 460 units higher than Q3 2018" were "***all organic growth.***"

64.    During the same call, defendant Lopez indicated that PlayAGS would continue to see "further growth in Oklahoma":

The second initiative is the ramping of Orion Slant and our STAX Table Progressive, two relatively new products that are seeing strong momentum as we start 2019. *We highlighted the progress both products made in the fourth quarter, exiting the year strong to prepare for an even better 2019*. With 25 titles planned for launch on Orion Slant throughout the year and a growing number of compelling case studies that prove STAX drive increased revenue for customers, we believe *both products will be significant needle movers in their respective business segments this year*. The third initiative is new product introductions, and we have several that we're excited about this year. We saw the first unit of Dex S card shuffler go into a select couple of properties on trial in December. *The feedback has been encouraging, consistent and informative in this introductory stage. We're currently in a handful of properties and right where we want to be with the rollout, having just completed some enhancements to prepare us for a broader launch*. By Q2, we believe we'll be in position to ramp up the rollout to several jurisdictions, including California, Florida, Oklahoma, Nevada, Michigan and New Mexico to start.

*     *     *

The fourth initiative is penetration into new and early-entry markets. Slide 12 shows the many markets where AGS remains well under our 5% market share goal. *We remain focused on working to secure some new licenses this year, but we believe that the bigger opportunity is placing incremental EGM and table units into new markets like Canada, Pennsylvania and Ohio as well as further growth in Oklahoma, California and Wisconsin to name a few*.

65.     In response to an analyst question regarding PlayAGS's optimization efforts in light of the Company's acquisition of Integrity, defendant Lopez assured the Company would be "very measured":

Yes. So I think the entire Integrity acquisition and that project comes in phases. We'll start with low-hanging fruit early, which is sort of like some bad -- some public costs and some corporate public costs. *We want to sort of monitor here -- early on here. Andrew and the team will watch very closely what's going on with the Integrity units, the installs. We really need to get to other customers. We want to make sure we don't just run out there and start optimizing things sort of willy-nilly. We want to be very measured*. This will go into our bucket of everything else that gets optimized. It's not like we're specifically going to target Integrity units. We're going to put it into the hopper. *As we like to say, turn it over to our team of nerds, on Andrew's team and then finance, they'll analyze things, and then we'll optimize appropriately and judiciously throughout the year and make sure we don't jump out there and do anything too soon*. But I think that that's the way we look at it. We -- as far as growth goes in the Integrity acquisition, we talked about somewhere around on the upper end of what we're looking for organic growth like around that 15% mark. And we expect to be able to execute on that. If you sort of take 2018 EBITDA for them and you pro forma it for the partial year and then you add back some growths, that's essentially what we've gotten the number for us this year.

66.     Finally, in response to analyst questions regarding the Company's ability to further grow its recurring revenues, defendant Lopez said Oklahoma was a "strong jurisdiction[]" that would lead recurring revenue growth in 2019:

Yes. So I think that when you look at recurring -- our recurring footprint, and I'll speak to that number sort of globally. When we're expanding in 2019, obviously, it's going to be sort of like equal opportunity sort of like placements for leases. *But again, we're going to be right back in our very strong jurisdictions like Oklahoma*. We're going to see real growth in Mexico again. We're obviously going to see going to see some international or what I'd say is true international growth because I sort of look at Mexico as almost domestic, but we'll see some true international growth with leased units in the Philippines. *So when you put those altogether, we've got real opportunities for recurring revenue growth in 2019 that, I think, that will shape up very nicely versus what we did even in 2018. But I think it's the usual suspect that can -- when you look at the domestic opportunities being led again -- once again by the state of Oklahoma*.

67.     The above statements on March 5, 2019 were materially misleading because they failed to disclose: (i) that sales teams were pressured to inflate EGM-placement numbers, including persuading customers to place orders in an earlier or later quarter than planned and recording one

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
19

1  sale as two sales; (ii) that, as a result, the key Oklahoma market was flooded with more EGMs than

2  it could support and at unfavorable terms; (iii) that, as a result of the foregoing, PlayAGS's purported

3  revenue growth was unsustainable; and (iv) that PlayAGS acquired low RPD units through the

4  Integrity acquisition that it would have to offload these units elsewhere.

5       68.    Also on March 5, 2019, the Individual Defendants caused PlayAGS to file its annual

6  report on Form 10-K for the period ended December 31, 2018 (the "2018 10-K") affirming the

7  previously reported financial results. It was signed by defendants Lopez, Akiona, Sambur, Cohen,

8  Press, Landau, Chibib, and Freeman. The report claimed that the Company's "strategy of producing

9  diversified content will enable [it] to maintain and grow [its] market leadership within [its] current

10 Class II base, as well as continue [its] expansion."

11      69.    The 2018 10-K also listed risks that **could** affect the Company's operations. For

12 example, it stated that PlayAGS's "failure to successfully implement an effective placement strategy

13 **could** cause [its] future operating results to vary materially from what management has forecasted."

14      70.    The 2018 10-K further stated:

15       ***We generate a substantial amount of our total revenue from two customers and in
         two states.***

16

17       For the year ended December 31, 2018, approximately 22% of our total revenue was
         derived from gaming operations in Oklahoma, and approximately 11% of our total
18       revenue was from one Native American gaming tribe in that state. Additionally, for
         the year ended December 31, 2018, approximately 9% of our total revenue was
19       derived from gaming operations in Alabama, and approximately 9% of our total
         revenue was from one Native American gaming tribe in that state. The significant
20       concentration of our revenue in Oklahoma and Alabama means that local economic,
         regulatory and licensing changes in Oklahoma or Alabama may adversely affect our
21       business disproportionately to changes in national economic conditions, including
         adverse economic declines or slower economic recovery from prior declines. ***While
22       we continue to seek to diversify the markets in which we operate, changes to our
         business, operations, game performance and customer relationships in Oklahoma***
23       or Alabama, ***due to*** changing gaming regulations or licensing requirements, higher
         taxes, ***increased competition, declines in market revenue share percentages or
24       otherwise, could have a material and adverse effect on or financial condition and
         results of operations.*** In addition, changes in our relationship with our two largest
25       customers, including any disagreements or disputes, a decrease in revenue share,
         removal of electronic gaming machines or non-renewal of contracts, could have a
26       material and adverse effect on our financial condition and results of operations.

27      71.    The above statements in the 2018 10-K were materially misleading because they

28 failed to disclose: (i) that the key Oklahoma market was flooded with more EGMs than it could

1   support and at unfavorable terms;  (ii) that, as a result, PlayAGS was not achieving earnings targets;

2   (iii) that the Company's largest revenue center had lower RPD than the Company's average; and

3   (iv) that, as a result, the Company was not and could not capture growth in the market, but instead

4   needed to scale back its operations in Oklahoma.

5         72.    On March 20, 2019, PlayAGS registered for sale and issued 4 million shares of

6   common stock at a price of $25.50. The shares were sold pursuant to a shelf registration process,

7   whereby the shelf registration statement was filed on Form S-3 on August 6, 2018 (signed by

8   defendants Lopez, Akiona, Sambur, Cohen, Press, Landau, and Chibib) and the prospectus

9   supplement was filed on Form 424b1 on March 20, 2019. The Apollo entities received the proceeds

10  from the offering. The prospectus supplement incorporated by reference the 2018 10-K and was

11  misleading for the previously identified reasons. Moreover, it incorporated by reference the Form

12  8-K filed with the SEC on February 11, 2019, which stated that the Integrity acquisition would "be

13  a relatively seamless transition and one that gives us an opportunity to work with operators to ensure

14  they are getting the best performance from their Integrity-placed games."

15        73.    The above statements on March 20, 2019 were materially misleading because they

16  failed to disclose: (i) that sales teams were pressured to inflate EGM-placement numbers, including

17  persuading customers to place orders in an earlier or later quarter than planned and recording one

18  sale as two sales; (ii) that, as a result, the key Oklahoma market was flooded with more EGMs than

19  it could support and at unfavorable terms; (iii) that, as a result of the foregoing, PlayAGS's purported

20  revenue growth was unsustainable; and (iv) that PlayAGS acquired low RPD units through the

21  Integrity acquisition that it would have to offload these units elsewhere.

22        74.    On May 3, 2019, the Company announced that its contract with the Chickasaw

23  Nation had been renewed.  The Chickasaw Nation accounted for approximately 11% of the

24  Company's total revenue for the twelve months ended June 30, 2018.  Renewing the contract was

25  significant to investors due to the importance of the Oklahoma market and Lopez had previously

26  assured them the Company was "working diligently to deal with" the Chickasaw Nation on the

27  November 8, 2018 earnings call.

28

75.     On May 8, 2019, the Individual Defendants caused the Company to issue a press release announcing its 1Q 2019 financial results. The press release reported quarterly revenues of $73.0 million, up 13 percent year-over-year, a 33 percent increase in EGM equipment sales, and reiterated the Company's previous 2019 guidance:

> "***I'm pleased to report another solid quarter of growth for AGS, with total revenue of $73 million up 13% year-over-year, driven by double-digit gains in EGMs and Tables***," said Chief Executive Officer David Lopez. "*. . . **AGS is well-positioned for continued long-term, meaningful growth.***"

> First Quarter 2019 Financial Highlights

> ***Total revenue increased 13% to $73.0 million, driven by continued growth in our EGM segment***, primarily sold units in early-entry markets such as Michigan, Saskatchewan, Pennsylvania and Massachusetts, as well as continued penetration into ramping markets such as Florida and California in addition to the contribution of leased EGMs acquired from Integrity Gaming Corp. ("Integrity") in February 2019.

> \*        \*        \*

> 2019 Outlook

> Based on our year to date progress, we continue to expect to generate total adjusted EBITDA of $160 - $164 million in 2019, representing growth of approximately 17% - 20% compared to the prior year period. We also continue to expect 2019 capital expenditures to be in the range of $64 - $69 million, compared to $66.6 million in 2018, ***reflecting an expectation for a continued increase in our installed base in both existing and new markets as well as our ongoing yield optimization initiative, including units recently purchased from Integrity***.

76.     The same day, PlayAGS held a conference call in connection with the financial results. Defendant Akiona touted PlayAGS's "ongoing success" in its EGM segment:

> ***Turning to our EGM segment, first quarter EGM sales increased 33% year-over-year to $20.2 million***, due to the sale of 1,024 units as compared to 838 in the prior year period. The current quarter included approximately 100 sold units to new and expansionary properties. ***Our ICON and Orion family of cabinets continued to drive our ongoing success in penetrating the Class III market.***

> In our domestic EGM gaming operations business, our installed base grew by over 2,245 units year-over-year, and over 2,500 units sequentially, driven primarily by the purchase of approximately 2,500 EGMs from Integrity, which closed in February of this year. We recorded approximately $2 million in recurring revenue from the Integrity EGMs in the first quarter. We also increased placements of Orion Portrait, Orion Slant, and ICON cabinets on lease. Year-over-year increases in the domestic installed base also included the voluntary removal of 500 machines from a single customer in Texas in the prior year, as well as an end of lease buyout by a customer who purchased 420 VLT machines in 2018, and another 130 VLT machines in the first quarter of this year.

77.   On the earnings call, Lopez touted the Company's growth prospects in North America, stating:

> Slide 9 shows that **we continue to grow our footprint in North America with three key EGM products** and as of Q1, we were at 2.9% market share, up from 2.3% in Q1 of last year. That is a considerable gain for AGS, resulting in approximately 6,000 new units in the domestic marketplace. **There is a significant opportunity this year to increase penetration in Canada, Pennsylvania, Nevada and Ohio, to name a few, keeping us on a very achievable path to 5% market share.**

78.   The above statements on May 8, 2019 were materially misleading because they failed to disclose: (i) that sales teams were pressured to inflate EGM-placement numbers, including persuading customers to place orders in an earlier or later quarter than planned and recording one sale as two sales; (ii) that, as a result, the key Oklahoma market was flooded with more EGMs than it could support and at unfavorable terms; (iii) that, as a result of the foregoing, PlayAGS's purported revenue growth was unsustainable; and (iv) that PlayAGS acquired low RPD units through the Integrity acquisition that it would have to offload these units elsewhere.

### C.   The Truth Begins to Emerge While the Individual Defendants Continue to Issue Materially Misleading Statements

79.   On August 7, 2019, PlayAGS began to acknowledge that the purported growth in Oklahoma was unsustainable and had caused problems. Specifically, the Company announced its second quarter 2019 financial results, reporting a net loss of $7.6 million and a 2% year-over-year decline in adjusted EBITDA. Also, for the first time since it went public, the Company lowered its full year 2019 adjusted EBITDA guidance to a range of $145 million to $150 million down from a range of $160 million to $164 million.

80.   The same day, the Company held a conference call to discuss its disappointing financial results for the 2Q 2019, which were attributed to "challenges in Oklahoma." Akiona attributed the poor performance to three Oklahoma properties and the Company having flooded the Oklahoma market with 800 additional EGMs over the past year, which "largely account[ed] for the [Company's] decrease in RPD" as Oklahoma had "a lower RPD than [its] domestic average." When asked if the issues were due to a change in the business or demand, Lopez admitted that the Company's addition of new units, plus its optimization strategy resulted in the Company "[going] deeper into [its] title portfolio than [it] should have." Lopez acknowledged that the PlayAGS's

"record breaking" growth was unsustainable, stating that the Company went "too hard and fast into the market with certain products" and "too deep into [its] portfolio of titles," rather than focusing on the Company's "most successful game themes."

81.     On this news, the Company's share price fell $8.99, or nearly 52%, to close at $8.31 per share on August 8, 2019.

82.     That same day the Company filed its 10-Q for the 2Q 2019 where it reported a loss in domestic RPD due to "new installations in markets with lower revenue per day, as well as the inclusion of EGMs from Integrity, which historically generated revenue per day lower than the Company's average."

83.     Nevertheless, the Individual Defendants continued to issue materially misleading statements. During the conference call, Lopez assured investors that the Company was implementing measures to correct this problem, stating ***"[w]e are implementing a variety of measures to help correct this and improve performance in Oklahoma*** going into the second half of the year. What's important to note that this is not attributable to the market itself. *Oklahoma has been and continues to be a healthy market*."

84.     Lopez went on to state that the Company "know[s] how to fix" its problems in Oklahoma:

> We did have weather in Oklahoma, but it wasn't to the magnitude that we saw in Q1. So it just was very clear for us to look at it and how it accumulated over time and we're able to understand it. We could actually look back at Q1 and say, with some of what we saw in Q1, like I referred, was it little bit of a head fake and it very well could have been. ***But now in Q2, it just became much more clear to us, but in that clarity is the solution. Right. And in that clarity. We know how to fix it. We know how to go out there and get after the problem and resolve it over time***.

> \*       \*       \*

> So those are the kind of things that we went in, we analyzed and understood them. And we said, hey, where does this exist, well, ***it comes down to Oklahoma, it comes down to certain decisions we made there and it even comes down largely in that space to just a handful of accounts. So it's very well known. We know what we need to do. We know where we misstep-ped on that. We know how to get out there and understand how to fix it***.

The above statements were materially misleading because they failed to disclose: (i) that sales teams were pressured to inflate EGM-placement numbers, including persuading customers to

place orders in an earlier or later quarter than planned and recording one sale as two sales; (ii) that, as a result, the key Oklahoma market was flooded with more EGMs than it could support and at unfavorable terms; (iii) that, as a result of the foregoing, PlayAGS's purported revenue growth was unsustainable; and (iv) that PlayAGS acquired low RPD units through the Integrity acquisition that it would have to offload these units elsewhere.

85.     On November 7, 2019, the Company reported that domestic RPD had declined 8% and Oklahoma RPD had declined 17% due in part to the "continued product performance previously identified."

86.     The same day, the Company held a conference call to discuss these financial results. Despite reporting an 8% decline in domestic EGM revenue per day, driven in part by a 17% decline in RPD in Oklahoma, Lopez assured investors that *"[w]ith great certainty we do understand the challenges we face in Oklahoma market and we are addressing them with specific and targeted countermeasures."* He listed the actions the Company was taking to "stabilize performance."

> Since the close of Q2 and throughout Q3, we have continued to analyze our footprint, the market and the competition which has led to our conclusion that the issues are clearly twofold. First, as we indicated on our Q2 call, *we did have some product rollout game performance in analytics issues that negatively impacted our RPD performance in the state. Second is that it's clear that the influx of premium competitive product that entered this space in 2018 has continued to perform well and has taken Oklahoma 2 premium products share levels that rival some of the highest in the nation.*
>
> *                    *                    *
>
> To date we have touched more than 900 units in Oklahoma. Touches include any change we make to a unit, including game title changes, cabinet swaps or on floor relocations. *Most of our actions thus far have been title changes on specifically targeted lower performing units which requires de minimis CapEx and has helped stabilize performance on those optimized units. Although we are moving quickly on these changes, it will take some time before there is a material impact on both the Oklahoma numbers and our overall domestic RPD. Our objective is to address nearly 1,500 units by year-end* and to be prudent in 2020 with our utilization of new higher earning premium products such as Orion Rise and Orion 49C.

87.     Akiona confirmed on the call that the Company's decrease in domestic RPD was due to underperformance in Oklahoma:

> *Domestic EGM revenue per day or RPD decreased by 8%* to $25.08 compared to $27.14 in the prior year period. When normalized for the impact of EGMs purchased from Integrity, we estimate that domestic RPD was $26.55, down approximately 2%.

***The decrease is primarily due to product underperformance in Oklahoma***, which David just discussed.

Slide 10 breaks out Oklahoma RPD and bifurcate Integrity performance from our legacy base. We grew recurring revenue by 11% year-over-year due to the Integrity acquisition along with growth of more than 1,200 AGS incremental units. ***Because our Oklahoma units yield on average an RPD that is lower than our domestic average RPD, these organic placements have the effect of pulling down our overall domestic RPD while still increasing both revenue and EBITDA.***

88.     On this news, PlayAGS's stock price fell 6.71% to close at $11.82 per share on November 8, 2019.

89.     On that call, Akiona told investors the Company had "seen the bottom:"

We've been monitoring the market very closely, looking at it obviously week to week, month to month and from our perspective looking at revenue in the state and looking at RPD, we can sort of see that leveling off for that inflection point. In order to bounce off back and to really see growth into the future, that's where our comes [sic] into some of the things we've talked about in the past and of course at G2E which is releasing some of our premium cabinets into the market. So first, it will be the Rise cabinet. Second, that will come in – very likely be the curve or our 49C and then of course Starwall in for the remainder of the year. So that's where I think that we can see and we can feel our confidence. ***We've understood the problem very clearly***. You heard what we said in our prepared remarks there. ***We're seeing it level off, we're often asked that we've seen the bottom. We feel like we've seen it now and going forward, we see that our optimization has been effective and that the new products, especially premium products to compete in that market is a true requirement and that's what we're rolling out.***

90.     The above statements were materially misleading because they failed to disclose that: (i) sales teams were pressured to inflate EGM-placement numbers, including persuading customers to place orders in an earlier or later quarter than planned and recording one sale as two sales; (ii) that, as a result, the key Oklahoma market was flooded with more EGMs than it could support and at unfavorable terms; (iii) that, as a result of the foregoing, PlayAGS's purported revenue growth was unsustainable.

**D.     The Truth Fully Emerges**

91.     On March 4, 2020, PlayAGS again reported a decrease in domestic EGM revenue per day "driven by incremental units in Oklahoma that yield lower RPD than our domestic average." Rather than continue its optimization efforts, PlayAGS acknowledged it needed to "prune" up to 1,000 these underperforming units in 2020 to generate cash to reinvest in other higher-performing markets or to improve RPD in Oklahoma.  The Company reported a 13% increase in sales revenue,

1  "driven by increased EGM unit sales as well as ***the sale of 327 previously leased, lower-yielding***

2  ***Oklahoma units to a distributor as part of our ongoing strategic management of our installed***

3  ***base***."

4        92.    On an earnings call held the same day, Lopez discussed the Company's plan to sell

5  its underperforming units in Oklahoma and re-investing the proceeds in "higher-performing

6  markets":

7      ***EGM sales revenue also included the sale of approximately 300 lower RPD Class***
    ***III units from the Integrity installed base***. That said, we did not count these units in

8      our sold number KPI of 1,283 units. As we have talked about on our last 2 earnings
    calls, ***we have been working to better manage our footprint in Oklahoma***. After

9      evaluating our capital strategy and analyzing the current operating environment in
    Oklahoma, ***we believe the prudent thing to do is to sell some of our***

10      ***underperforming units to generate cash that can be invested in other higher-***
    ***performing markets, or we can choose to allocate some of those dollars to improve***

11      ***revenue per day in Oklahoma.*** Moving to RPD. Year-over-year domestic yields of
    $24.97 were down 5%. Outside of Oklahoma, our domestic RPD grew 7% year-over-

12      year to $35.63 driven by a strong performance from our Orion family of cabinets.

13        93.    Lopez said PlayAGS had come up with "targeted countermeasures" to combat the

14  weak RPD in Oklahoma, including "game title changes, cabinet swaps, on floor relocations and

15  selling of underperforming units."  Akiona further elaborated on the strategy, stating:

16      As we consider the current operating environment ***in Oklahoma, we have begun to***
    ***strategically sell or prune some underperforming parts of our footprint this year***

17      ***in locations where we do not believe the capital outlay would generate the best***
    ***returns for us. This could impact the Oklahoma installed base by about 500 to***

18      ***1,000 units in 2020.*** By executing on these initiatives, we believe we will exit 2020
    with a more optimal footprint, greater stabilization in the base and better cash returns

19      moving forward.

20        94.    Lopez explained another PlayAGS initiative that sought to improve RPD in

21  Oklahoma:

22      The final initiative focuses on generating the best returns on our cash by investing in
    new product categories as well as focusing our efforts to improve revenue per day in

23      Oklahoma. We believe the best uses of our cash are twofold: first, launching new
    premium products into the Class III and Class II premium lease-only market, which

24      represents ample white space for us; and second, selectively optimize our cash
    returns in markets like Oklahoma and Mexico to drive gains in RPD and improve

25      overall yields and cash flow.

26        95.    Lopez confirmed to an analyst that the number of units touched in Oklahoma was a

27  "moving target":

28

**Brad J. Boyer** - Stifel, Nicolaus & Company, Incorporated, Research Division – Analyst

Okay. Very helpful. And then second, you guys did provide a lot of color around Oklahoma. One thing I noticed just in the slides, it looks like to date, you've touched over 1,500 units. I know it's kind of a moving target, but is a little bit higher than kind of what we had talked about previously kind of 1,200. I guess, just curious where we stand there in the -- as far as realigning games, putting capital into sort of optimizing Oklahoma. I mean *is it your expectation that we're going to continue to see a significant number of units beyond the 1,500 level touched as we move into 2020?* Or do you think we're kind of in the latter innings of sort of that revitalization of the base process in Oklahoma?

**David B. Lopez** - PlayAGS, Inc. - CEO, President & Director

I think -- good question. *I think, as you said, it's a moving target*. As far as we're concerned, we look at those changes as both being game conversions and cabinet swaps. We're trying to be as judicious as we can with cabinet swaps because that's where the capital sits. As far as game theme conversions, we've actually had very good results with those. We look at those numbers weekly and monthly. The returns on that, obviously, are very good. The cost is de minimis. And the returns on that -- on the cost is really just labor getting out there, and we can make that money back very quickly. But we can see a demonstrable return on those changes. Those will continue. As far as how we're going to go out and touch the base, we've got about 10,000 -- roughly 10,000 units out there or so in Oklahoma, so we've touched 15% of it. I think there's still plenty more to get to, but those touches will include simple game conversions.

96.    Defendant Akiona explained the Company would continue to sell underperforming units in 2020, explaining "[w]e are open to selling certain portions of our footprint on a, call it, specific analysis basis. And so you'll see some of that in probably the first half of the year."

97.    On this news, PlayAGS's stock price fell 18.7% to close at $6.65 per share on March 5, 2020.

On May 7, 2020, the Company filed its 10-Q for the first quarter 2020 ended March 31, 2020, reporting that its installed base in Oklahoma and domestic RPD had declined.  It stated that "[a]dditional decreases in gaming operations revenue are due to a decrease in our EGM installed base year over year due to sales of over 700 previously leased, lower yielding units to distributors (395 of which were sold in the current period) and the sale of 150 units of previously leased VLT EGMs."

98.    On an earnings call that same day, Lopez said that in order to improve RPD and profitability PlayAGS needed to "pare back the install base in Oklahoma . . . essentially have a smaller install base."

## VI.    DAMAGES TO THE COMPANY

99.    As a direct and proximate result of the Individual Defendants' conduct, PlayAGS has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

      a.   Legal fees incurred in connection with the Securities Class Action;

      b.   Any funds paid to settle the Securities Class Action; and

      c.   Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to PlayAGS.

100.    In addition, PlayAGS's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

101.    The actions complained of herein have irreparably damaged PlayAGS's corporate image and goodwill.  For at least the foreseeable future, PlayAGS will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that PlayAGS's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

102.    Plaintiff brings this action derivatively in the right and for the benefit of PlayAGS to redress injuries suffered, and to be suffered, by PlayAGS as a direct result of the wrongdoing alleged herein.  PlayAGS is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

103.    Plaintiff will adequately and fairly represent the interests of PlayAGS in enforcing and prosecuting its rights.

104.    Plaintiff has continuously been a shareholder of PlayAGS at times relevant to the wrongdoing complained of and is a current PlayAGS shareholder.

105.    When this action was filed, PlayAGS's Board of Directors consisted of defendants Chibib, Cohen, Freeman, Landau, Lopez, Massion, and Sambur.  Plaintiff did not make any demand

on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

106.    Chibib, Cohen, Freeman, Landau, Lopez, and Sambur served on the board before the Company's secondary offering in March 2019 and knew of the material adverse trends regarding the operations in Oklahoma. They signed the shelf registration statement and knew that it omitted these material adverse trends, and did not cause PlayAGS to correct these statements in the corresponding prospectus supplement. As a result, Chibib, Cohen, Freeman, Landau, Lopez, and Sambur are defendants in the Securities Class Action for violations of the Securities Act, which does not require a showing of intent or scienter, and therefore face a substantial risk of liability. As a result, they are not disinterested, and demand is excused as to them.

107.    At all relevant times, Lopez was the Company's CEO, and therefore was not independent under NASDAQ listing rules. As an employee, Lopez derives substantially all of his income from his employment with PlayAGS, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or his fellow members of management with whom he works on a day-to-day basis. Moreover, as CEO, Lopez knew or recklessly disregarded the sales tactics employed in the Company's key market and the declining earnings. Lopez personally issued the materially misleading statements and concealed the material facts described herein. As a result, Lopez would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

108.    Furthermore, Chibib, Landau and Freeman also served as members of the Audit Committee at relevant times. As such they are responsible for the integrity of PlayAGS's financial statements.  In their capacities as Audit Committee members, Chibib, Landau and Freeman reviewed and approved the materially misleading statements and allowed them to be disseminated in PlayAGS's SEC filings and other disclosures.  Thus, Chibib, Landau and Freeman breached their fiduciary duties and are not disinterested, and demand is excused as to them.

## VIII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Against the Individual Defendants for Breach of Fiduciary Duty)**

109.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

110.   Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of PlayAGS's business and affairs, particularly with respect to issues as fundamental as public disclosures.

111.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of PlayAGS.

112.   In breach of their fiduciary duties owed to PlayAGS, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

113.   In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

114.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, PlayAGS has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

### SECOND CAUSE OF ACTION

**(Against Defendants Lopez and Akiona for Contribution for Violations of Sections 10(b) and 21D of the Exchange Act)**

115.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.    Defendants Lopez and Akiona are named as defendants in related securities class action. The conduct of these Defendants, as described herein, has exposed the Company to significant liability under the federal securities laws by their disloyal acts.

117.    PlayAGS is named as a defendant in related securities class action that alleges and asserts claims arising under Section 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If PlayAGS is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

118.    As officers, directors, and otherwise, Defendants Lopez and Akiona had the power or ability to, and did, control or influence, either directly or indirectly, PlayAGS's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

119.    Defendants Lopez and Akiona are liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

120.    Defendants Lopez and Akiona have damaged the Company and are liable to the Company for contribution.

121.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

IX.    **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of PlayAGS, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of PlayAGS and that plaintiff is an adequate representative of the Company;

B.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to PlayAGS;

D.      Directing PlayAGS to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect PlayAGS and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen PlayAGS's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of PlayAGS to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Individual Defendants' trading activities or their other assets so as to assure that plaintiff on behalf of PlayAGS has an effective remedy;

F.      Awarding to PlayAGS restitution from Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

1

## I.  **JURY TRIAL DEMANDED**

2

     Plaintiff hereby demands a trial by jury.

3

Dated:  March 18, 2022

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  /s/ John P. Aldrich
John P. Aldrich, Esq.
Nevada Bar No. 6877
**ALDRICH LAW FIRM, LTD.**
7866 West Sahara Avenue
Las Vegas, Nevada 89117
Tel:  (702) 853-5490
Fax:  (702) 227-1975

**GLANCY PRONGAY & MURRAY LLP**
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: prajesh@glancylaw.com

Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, NY 10019
Telephone: (212) 935-7400
Facsimile: (212) 756-3630
Email: bsachsmichaels@glancylaw.com

*Counsel for Plaintiff Manjan Chowdhury*

## **VERIFICATION**

I, Manjan Chowdhury, do hereby verify that I am a holder of common stock of PlayAGS, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Date:   3/16/2022                                    *Manjan Chowdhury*
                                                     _____
                                                     Manjan Chowdhury